FILED

2013 Oct-08  PM 02:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **DEBORAH K. BROCK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **4:10-cv-2860-LSC** |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of the Social** ) | |
| **Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OF OPINION

Plaintiff Deborah Brock ("Plaintiff") brings this action pursuant to Title II of Section 205(g) and Title XVI of Section 1631(c)(3) of the Social Security Act (the "Act"), seeking review of the decision by the Commissioner of the Social Security Administration[1] ("Commissioner") denying her claims for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI"). *See also* 42 U.S.C. §§ 405(g), 1383(c).  After careful review, the court finds that the decision of the Commissioner is due to be affirmed.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Therefore, she should be substituted for Commissioner Michael J. Astrue as Defendant in this suit. *See* Fed. R. Civ. P. 25(d)  ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

## I.    Proceedings Below

Plaintiff applied for DIB and SSI on October 4, 2004, alleging disability beginning on April 5, 2004, due to severe lower back pain, carpal tunnel syndrome in the right hand, migraines, and "problems with both feet." [R. 84; 98-99; 138; 142]. The Social Security Administration denied Plaintiff's claims on February 2, 2005. [R. 144]. Plaintiff requested and received a hearing before an administrative law judge ("ALJ") on July 19, 2006.[2] [R. 494-533]. The ALJ issued an opinion on December 2,

---

[2]   During the hearing, Plaintiff testified about her pain.  Plaintiff stated that she first experienced back pain in late 2003 or early 2004. [R. 514].  She indicated that her back pain radiated down both legs and that she was in constant pain. [R. 516].  According to Plaintiff, standing up aggravates her pain. [R. 521].  Plaintiff testified that at night she will sleep for about two hours before the pain wakes her up for an hour or two.  [R. 518-519].  According to Plaintiff, when this happens, she is in constant motion trying to relieve the pain. [R. 519].   Plaintiff was currently taking Oxycodone, Zanaflex, Elavil, and various other medications to treat nausea and high blood pressure. [R. 520-521].  Plaintiff stated she must take her pain medication every day. [R. 521].  No doctor had suggested Plaintiff would benefit from surgery. [R. 527].

Plaintiff also testified that she had been treated for bursitis in her right shoulder. [R. 515].  According to Plaintiff, injections helped relieve that pain for a short time. [R. 516].  Plaintiff testified she had not received physical therapy because she could not afford it. [R. 516].   Although Plaintiff had previously suffered from migraines, she stated she had not "had one in while." [R. 518].

Plaintiff stated that her pain prevented her from doing household chores as quickly as she could before. [R. 523].  She testified that she cooks less frequently and that her husband did the grocery shopping. [R. 524].  Plaintiff stated she could shower and bathe independently but sometimes used a shower chair. [R. 524].

A vocational expert ("VE") also testified at the hearing that Plaintiff's past relevant work included jobs as a substitute teacher and sewing machine operator. [R. 529-530]. Rather than posing a hypothetical to the VE, the ALJ noted his dissatisfaction with the record and gave Plaintiff an additional 30 days to submit evidence from treating sources. [R. 531-532].

2006, denying Plaintiff's applications.[3] [R. 47-52]. The Appeals Council subsequently

granted Plaintiff's request for review and remanded the case to a different ALJ.[4] [R.

390-392]. After a supplemental hearing on April 11, 2008 [R. 534-589], the ALJ issued

a decision on September 3, 2008, denying Plaintiff's applications. [R. 23-29].  On

August 3, 2010, the Appeals Council denied Plaintiff's request [R. 6-8], making the

Commissioner's decision final and a proper subject of this court's judicial review. *See*

42 U.S.C. §§ 405(g), 1383(c)(3).

## A.    Supplemental Hearing

---

[3] After finding that Plaintiff did not have an impairment or combination of impairments that have significantly limited her ability to perform work-related activities for 12 consecutive months, the ALJ terminated his analysis at step two of the sequential evaluation and concluded that Plaintiff was not disabled within the meaning of the Act. [R. 47-52; 390].

[4] In its order remanding the case to an ALJ, the Appeals Council noted that Social Security Ruling 85-28 stipulates that a claimant may only be "disabled" at step two of the evaluations under limited circumstances. [R. 390]. Having concluded those circumstances were not established in this case, the Appeals Council further noted that Plaintiff's impairments, and their associated limitations, meet the definition of severe impairment and that further evaluation beyond step two was required. [R. 390-391]. The Appeals Council also found that although the hearing decision indicated Plaintiff's subjective complaints were not entirely credible, the ALJ failed to consider the proper factors in evaluating credibility. [R. 391]. Upon remand, the new ALJ was instructed to do the following: (1) update the record with any available evidence from treating and/or examining sources with medical source statements about what Plaintiff could do despite her impairments; ( 2) further evaluate Plaintiff's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms, including 20 C.F.R. §§ 404.1529, 416.929 and Social Security Ruling 96-7p; (3) give consideration to all opinion evidence and explain the weight given to such evidence; (4) give consideration to Plaintiff's maximum residual functional capacity ("RFC") and provide appropriate rationale and specific references to evidence of record in support of the assessed limitations; and (5) obtain evidence from a vocational expert to clarify the effect of the assessed limitations. [R. 391].

The ALJ to whom the Appeals Council remanded the case held a video hearing on April 11, 2009. [R. 536].  The ALJ took testimony from three witness: Plaintiff; a medical expert; and a vocational expert ("VE").

### 1.    Plaintiff's Testimony

Plaintiff testified that she was currently experiencing pain at a five or six on a ten-point scale. [R. 569].  She stated that she could only sit for about 30 minutes before she begins to hurt. [R. 570].  Plaintiff further testified that she could only stand for about ten minutes before needing to sit down. [R. 570].  According to Plaintiff, on a good day, she could walk about a block before needing to stop and rest. [R. 570].  Plaintiff stated that she never experienced a day without pain. [R. 571].  Plaintiff further testified that she could not vacuum but that she could wash a few dishes. [R. 572].  Plaintiff stated when she tries to cook she has "to go get a chair and pull it up to the stove to finish cooking." [R. 572].  According to Plaintiff, her medications cause her to feel sleepy and drowsy. [R. 573].  Plaintiff also stated that her pain required her to lie down off and on throughout any given day for a total of two hours a day. [R. 574].

### 2.    Medical Expert's Testimony

Dr. Gerald Winkler, M.D., a board certified neurologist, testified as a medical

4

expert during the hearing.[5] Dr. Winkler reviewed Plaintiff's medical records including results from various medical tests, her history of back pain and headaches, and her treatment for bursitis.  [R. 539].

Dr. Winkler rejected Dr. Connor's diagnoses of radiculopathy and sciatica due to what he described as an "absence of data to support such" diagnoses. [R. 542]. Specifically, Dr. Winkler stated that Dr. Connor's examination in January 2007 that noted negative straight leg raising would undermine a radiculopathy diagnosis. [R. 546].  Dr. Winkler opined that he did not see evidence to support Dr. Ulrich's diagnoses of inflammation of the sacroiliac joint and inflammation of the bones of the back. [R. 544].  Dr. Winkler stated that Dr. Ulrich also commented on the bolt actuated sensory nerve conduction performed by Dr. Connor. [R. 544].  Dr. Winkler reviewed the test findings summary and stated it used many abbreviations and was "very cryptic." [R. 555-556].  Dr. Winkler also noted that the study findings stated that "clinical correlation is recommended," which according to Dr. Winkler suggested that no conclusions should be drawn based only on those test results. [R. 556].  Dr. Winkler also noted that Dr. Ulrich consulted with a neurologist to enhance his understanding of those test results and then indicated that the study signified

---

[5] Plaintiff's attorney did not object to Dr. Winkler's qualifications but reserved the right to question him regarding his familiarity with the listings. [R. 538].

5

something wrong with the "peripheral nerves neuropathy." [R. 544]. Dr. Winkler opined that he would not have adopted that conclusion based upon the evidence. [R. 544]. In response to further questioning by Plaintiff's attorney on this point, Dr. Winkler stated that he did not "see the evidence to support" a diagnosis of polyneuropathy as suggested by Dr. Ulrich in an August 2006 letter. [R. 553]. Dr. Winkler also stated that he saw no evidence in Plaintiff's medical records supporting Dr. Ulrich's internal disc destruction diagnosis. [R. 545].

Dr. Winkler testified that Plaintiff's physicians had interpreted her facets (which are surfaces that form joints in between the vertebrae in the back) as being the origin of her pain based upon the appearance of some minimal degenerative changes. [R. 549]. However, according to Dr. Winkler, these minimal degenerative changes appear in most individuals as they age and in many instances are not associated with any pain. [R. 549]. Thus, Dr. Winkler stated that although facets may be a source of pain, a physician should conclude so with caution. [R. 549-550].

Dr. Winkler testified that Dr. Ulrich's conclusion that Plaintiff was depressed was "a very plausible statement" and required more information in order to be adopted. [R. 557]. Dr. Winkler opined that "an objective basis for functional limitation has not been established" and that "the only limitation would derive from [Plaintiff's] subjective complaints of pain and the limitations resulting therefrom." [R.

6

565].

### 3.    Vocational Expert's Testimony

The VE testified that Plaintiff's past relevant work included jobs as a sewing machine operator and substitute teacher. [R. 566-568]. In response to a hypothetical posed by the ALJ, the VE testified that someone of Plaintiff's age, education, with work consistent with the VE's classification of Plaintiff's past relevant work, who could occasionally have pain up to one-third of the time but not such as could be debilitating where she has to lie down, could perform Plaintiff's past relevant work, which was classified as light work.  [R. 568].

In response to a hypothetical posed by Plaintiff's attorney, the VE testified that assuming if someone like Plaintiff had to lie down for a total of two hours during the day, there would be no jobs she could perform. [R. 577].

### B.    Medical Records

Plaintiff initiated care with Dr. Odeane Connor, M.D., on July 21, 2004, for treatment of lower back pain. [R. 210].  Dr. Connor saw Plaintiff on a monthly basis through mid-2007. [R. 195-212; 221-270; 287-333; 422-427; 434-463].  Dr. Connor diagnosed Plaintiff with low back pain with radiculopathy and sciatia. [R. 201, 204, 207]. Dr. Connor's physical examination notes vary little and indicate that Plaintiff's active and passive ranges of motion were within normal limits; that straight leg raise

testing was negative; that lumbar flexion extension and rotation were moderately limited; and that some tenderness was present upon palpation. [R. 201, 204, 207, 244, 246, 249, 253, 255, 257, 259, 261, 305, 307, 309, 311, 313, 315, 317, 318, 449, 453, 457, 461, 463].

A July 2004 MRI revealed minimal anterior osteophytic changes, and no herniation, significant disc bulging or significant disc abnormalities. [R. 194]. A CT scan performed one month later demonstrated normal lumbar discs without evidence of "annual bulge, disc protrusion, or disc extrusion." [R. 192]. A lumbar myelogram performed the same day indicated normal curvature and alignment. [R. 193]. No anterior or lateral defects were seen and the lumbar nerve root sleeves filled symmetrically. [R. 193].    In November 2004, Dr. Connor conducted a nerve conduction threshold. [R. 264]. The test results contain no interpretation or diagnosis. However, the test results state that "clinical correlation is recommended." [R. 264]. Dr. Odeane ordered another MRI in March 2006. [R. 319]. The test indicated minimal degenerative changes but vertebral alignment was well-maintained and there was no evidence of acute abnormality. [R. 319].

In March 2006, Plaintiff reinitiated care with a former provider, Dr. Russell Ulrich, D.O. [R. 347]. At this time, she reported that her blood pressure had been high. [R. 347]. Examination notes state that Plaintiff "[wa]s not having any other

8

problems." [R. 347].  Plaintiff saw Dr. Ulrich again in August 2006, at which time she reported that she had "significant back pain." [R. 346].  Treatment notes from this visit indicate that Plaintiff had applied for disability and had a hearing before an ALJ with only records from Dr. Connor. [R. 346].  Plaintiff's back was tender at L5-S1 but her straight leg raising and deep tendon reflexes were normal. [R. 346]. Progress notes dated two weeks later indicate that Dr. Ulrich had reviewed Dr. Connor's records. Dr. Ulrich noted the nerve conduction study was "different than [he had] seen before" because it separated pain fibers to determine if they were being injured. [R. 345].  According to Dr. Ulrich's reading of the test results, both of Plaintiff's pain fibers were being injured. [R. 345].  He diagnosed Plaintiff with low back pain and polyneuropathy. [R. 345].

In a letter to Plaintiff's attorney dated August 11, 2006, Dr. Ulrich opined that "[i]n today's medical world, [Plaintiff] most likely would be labeled with fibromyalgia because all her objective tests except for the nerve conduction studies have been normal." [R. 372].  Dr. Ulrich's letter also states that upon review of the nerve conduction study, he found objective evidence of polyneuropathy of the pain fibers but that the cause was still uncertain. [R. 372].   The letter further states that Plaintiff is not able to be gainfully employed because her pain is so severe that she cannot sit for prolonged periods of time. [R. 372].

Dr. Mohammad Ismail, M.D. completed a consultative disability determination examination on August 30, 2006. [R. 377-379].    Dr. Ismail's examination demonstrated that Plaintiff could sit and stand without any help and that she had a normal gait. [R. 378].   Plaintiff also had the ability to walk on heels and toes unrestricted. [R. 378].   Plaintiff did not limp and no staggering was observed during walking. [R. 378]. Touch, vibration, and pain sensations were increased in both legs up to the middle of the calf. [R. 378].   Plaintiff's reflexes were "brisk" in both legs. [R. 378].   Leg raising on each side did not produce any back pain and standing on her feet showed no deformity or swelling.   [R. 378].   Plaintiff was tender in the lumbar area before L4 and L5 and was tender on the sacroiliac joints on the right side. [R. 379]. But, her lumbar spine movements were unrestricted despite the pain and tenderness. [R. 379].   Dr.  Ismail diagnosed Plaintiff with non-mechanical back ache without any evidence of no functionality and possible neuropathy but no evidence of any neuropathic legs.[6]  Dr. Ismail noted that "[t]here was a question whether [Plaintiff] had neuropathy." [R. 377].   Dr. Ismail found no objective evidence of Plaintiff's complaints of pain and opined that no restriction kept her from working. [R. 379].

## II.    ALJ Decision

---

[6]  Dr. Ismail indicated that he could not comment about the nerve conduction study on his physical examination. [R. 379].

Disability under the Act is determined under a five-step test.  20 C.F.R. § 404.1520.   First, the ALJ must determine whether the claimant is engaging in substantial gainful activity.   20 C.F.R. § 404.1520(a)(4)(i).   "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a).   "Gainful work activity" is work that is done for pay or profit.   20 C.F.R. § 404.1572(b).   If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability.   20 C.F.R. § 404.1520(b).  Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities.   20 C.F.R. § 404.1520(a)(4)(ii).  Absent such impairment, the claimant may not claim disability. (*Id.*).   Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.  If such criteria are met, the claimant is declared disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her

impairments. 20 C.F.R. § 404.1520(e). In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled. (*Id.*). If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step. 20 C.F.R. § 404.1520(a)(4)(v). In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

In the instant case, the ALJ found that Plaintiff has not engaged in substantial gainful activity since April 5, 2004, the alleged onset date. [R. 24]. The ALJ then concluded that Plaintiff had the following severe impairments: migraine headaches and myofacial pain. [R. 24]. Nonetheless, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 27]. The ALJ found that Plaintiff has the RFC to perform her past relevant work as a sewing machine operator and substitute teacher, both of which are classified as semiskilled,

light work. [R. 28].  Accordingly, the ALJ concluded that Plaintiff was not disabled, as that term is defined in the Act. [R. 28].

## III.   Plaintiff's Argument for Reversal

Plaintiff seeks to have the Commissioner's decision reversed, or in the alternative, remanded for further proceedings. [Pl.'s Mem. 2].  Plaintiff contends that the ALJ's decision is not supported by substantial evidence and that improper legal standards were applied because: (1) the ALJ misapplied the Eleventh Circuit's pain standard for establishing disability; (2) the ALJ erred by limiting Dr. Winkler's testimony concerning pain; and (3) the ALJ erred in failing to consider Plaintiff's peripheral neuropathy of the lower extremities as a "severe" impairment in his analysis.  [Pl.'s Mem. 11-13].

## IV.   Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. §§ 405(g) and 1383(c)(3) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not

reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.   Discussion

After careful review, the court finds that substantial evidence supports the ALJ's opinion and that proper legal standards were applied.

### A.   The ALJ Properly Applied the Eleventh Circuit Pain Standard

Plaintiff's first argument on appeal is that the ALJ failed to properly apply this Circuit's pain standard. The court disagrees. For the reasons that follow, the court finds that substantial evidence supports the ALJ's conclusion that the pain standard

14

was not met.

"In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).  The ALJ need not cite to the pain standard so long as "his findings and discussion indicate that the standard was applied." *Id.* at 1225-26; *see also Wallace v. Barnhart*, 256 F. Supp. 2d 1360, 1377 n.9 (S.D. Fla. 2003) (finding that the ALJ properly applied the Eleventh Circuit's pain standard even though he did not cite or refer to the pain standard language as he cited to 20 C.F.R. § 404.1529, "which contains the same language regarding the subjective pain testimony that courts have interpreted when initially establishing the three-part pain standard").

The pain standard is designed to be a threshold determination made prior to considering Plaintiff's credibility." *Reliford v. Barnhart*, 444 F. Supp. 2d 1182, 1189 n.1 (N.D. Ala. 2006).  Thus, "[i]f the pain standard is satisfied, the ALJ must consider plaintiff's subjective complaints." *James v. Barnhart*, 261 F. Supp. 2d 1368, 1372

15

(S.D. Ala. 2003). In this instance, the ALJ may reject the claimant's subjective complaints but must articulate specific reasons for rejecting the testimony. *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992). If required, an ALJ's credibility determination need not cite particular phrases or formulations but it "must be so clear as to amount to a specific credibility finding." *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983).

The ALJ's decision is far from a model of clarity. The ALJ does not directly cite the pain standard language or the regulations containing similar phraseology. But, his findings and discussion suggest to the court the pain standard was applied and that he properly concluded that no objective evidence confirmed the severity of the alleged pain or that no objectively determined condition could reasonably be expected to give rise to the claimed pain. Based upon a review of the medical records and the testimony of Dr. Winkler, the ALJ essentially concluded that there was "no objective basis or evidence for [Plaintiff's] assertions of pain." [R. 26]. Although a claimant's subjective testimony *supported by medical evidence* that satisfies the pain standard is sufficient to support a disability finding, *see Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (emphasis added), here, the ALJ concluded that medical evidence did not support claimant's testimony, and therefore, she did not satisfy either part two or three of the pain standard. In reaching this conclusion, the ALJ meticulously recited

16

Plaintiff's treatment history before accepting Dr. Winkler's testimony that Plaintiff had no impairment or combination of impairments that meets or medically equals a listing. [R. 24-28].  For example, the ALJ noted that Plaintiff saw Dr. Connor for low back pain over the course of three years and that during this time: active and passive range of motion in Plaintiff's lower extremities was "consistently within functional limits;" straight leg raising tests were consistently negative; muscle tone was consistently within normal limits; lumbar flexion, extension, later bending and rotation were never more than moderately decreased; and, manual muscle testing in the lower extremities consistently produced findings of 4+/5 strength. [R. 24-25].   The ALJ further noted that when Plaintiff reinitiated primary care with Dr. Ulrich in March 2006, she "had no complaints of pain at all" and that Dr. Ulrich's examination was "completely unremarkable" at that time. [R. 25].

The ALJ also discussed Dr. White's treatment notes indicating negative straight leg raise and no overt sensory or motor deficits. [R. 25].  Regarding Dr. Ismail's claims-related consultative examination, the ALJ rejected his opinions concerning Plaintiff's functional status in reaching his decision.  However, he noted that Dr. Ismail's general findings that Plaintiff was able to sit and stand normally with no assistance, had a normal gait, and could walk on heels and toes without restriction were consistent with the findings of Plaintiff's treating physicians. [R. 25].  The ALJ

17

further recalled that Dr. Maddox's September 2006 examination notes referenced negative straight leg raising and  only some tenderness over the facet joints. [R. 25]. In addition to treatment and examination notes, the ALJ referred to various tests that had produced "unremarkable" results. [R. 25].  Specifically, the ALJ noted various MRIs, CT scans, lumbar myelograms, and epidurigrams that showed minimal degenerative facet changes, good flow along the nerve root, and no acute abnormalities. [R. 25].

The ALJ then credited Dr. Winkler's testimony rejecting Dr. Ulrich's apparent suggestion that internal disc disruption from an annular tear and facet joint arthropathy were the source of Plaintiff's pain. [R. 26].  He further accepted Dr. Winkler's conclusion that Dr. Maddox's impression that facet arthropathy was a source of Plaintiff's pain was hypothetical because the degenerative changes observed occur in most individuals as they age.  [R. 26].

Plaintiff contends that the ALJ relied almost exclusively on Dr. Winkler's testimony for his conclusion that Plaintiff is not disabled. [Pl.'s Mem. 6].  Plaintiff's argument on this point overlooks the extensive medical history recited above that the ALJ included in his opinion.  Plaintiff also maintains that "Dr. Winkler stated that the nerve conduction study was identifying a basis of a portion of [Plaintiff's] pain." [Pl.'s Mem. 7]. However, Plaintiff mischaracterizes Dr. Winkler's testimony

concerning nerve conduction testing:

> Dr. Winkler, the medical expert, then attempted to describe an objective basis for the plaintiff's pain which apparently fell on deaf ears. [R. 551]. Dr. Winkler pointed to an EMG or a nerve conduction study contained in the medical evidence of record and stated that it was positive or abnormal for a condition called peripheral neuropathy.

[Pl.'s Mem. 7]. Dr. Winkler did discuss the diagnosis of peripheral neuropathy by Dr. Ulrich. [R. 551]. Dr. Winkler explained that the test was not an EMG or nerve conduction test, but rather a type of test, which is part of a class of tests called quantitative sensory testing ("QST"). [R. 551]. Dr. Winkler was skeptical whether this testing alone would be sufficient for a diagnosis of peripheral neuropathy. Dr. Winkler testified about a paper published in the journal *Neurology* that was prepared by the Therapeutics and Technical Committee of the American Academy of Neurology. [R. 552]. Dr. Winkler testified that "one of its conclusions [was] that there is limited evidence to suggest that quantitative sensory testing may be useful in demonstrating altered threshold for pain perception in cases of various pain syndromes." [R. 552]. Dr. Winkler testified that the paper's conclusion was that "quantitative sensory testing results should not be the sole criteria utilized to diagnose structural pathology in the nervous system." [R. 552].

Plaintiff's attorney questioned Dr. Winkler and asked about Dr. Ulrich's indication that she had polyneuropathy. The attorney asked Dr. Winkler whether he

19

believed Plaintiff had polyneuropathy. [R. 553]  Dr. Winkler responded: "I don't see the evidence to support it, sir."  [R. 553].  The discussion of whether Plaintiff had neuropathy and whether the type of testing upon which Dr. Ulrich relied would support such a diagnosis continued for a number of pages in the transcript.  Contrary to Plaintiff's insinuation,  Dr. Winkler was not prevented from testifying about her alleged peripheral neuropathy.  Later in his testimony Dr. Winkler observed that the QST itself indicated that "clinical correlation is recommended."   [R. 556].  Dr. Winkler explained that if such testing correlated with other clinical data, it might be useful.  However, Dr. Winkler again noted the absence of electromyography (EMG) or nerve conduction studies (NCS), which are the standard tests used to identify peripheral neuropathy. [R. 556].  Dr. Winkler explained that if a physician has a strong suspicion that there is a disorder of the peripheral nerves, such testing would be appropriate. [R. 556].  However, Dr. Winkler believed that those tests were not indicated based upon Plaintiff's treatment history: "I would point out that the examination findings do not leave the strong suspicion of the involvement of peripheral nerves because the neurologic examination findings recorded by the examining physician, including Dr. Ulrich, [are] normal." [R. 556].

Plaintiff asserts that Dr. Winkler was not allowed to fully explain the results of the quantitative sensory testing:

> Consequently, even though Dr. Winkler attempted to explain this to the
> ALJ, the ALJ rejected his conclusions because it contained something of
> an assessment of the plaintiff's pain. This is the entire fallacy associated
> with the conclusions of the ALJ. This is a pain case - simple and to the
> point. Is there a legitimate medical basis for the plaintiff's complaints of
> pain? Dr. Winkler says yes; the electrodiagnostic testing says yes but the
> ALJ says no.

[Pl.'s Mem. 8]. From the discussion above, it is clear to the court that Dr. Winkler

was not prevented from explaining Plaintiff's nerve testing.  It is also clear that Dr.

Winkler did not believe there was a legitimate medical basis for diagnosing Plaintiff

with peripheral neuropathy.

Plaintiff concludes her discussion of Dr. Winkler's testimony by asserting:

"The ALJ's own witness [Dr. Winkler] provided medical information that tends to

support the plaintiff's allegations of disabling pain."  [Pl.'s Mem. At 8].  However,

this was exactly the opposite of the import of Dr. Winkler's testimony.  In the end, Dr.

Winkler was asked to "identify any restrictions in terms of functionally, exertional,

postural, or whatever, what if any they would be, or would there be none." [R. 565].

Dr. Winkler responded: "On an objective basis, an objective basis for functional

limitation has not been established.  So that the only limitation would derive from the

Claimant's subjective complaints of pain and limitations resulting therefrom." [R.

565].  Dr. Winkler ruled out both fibromyalgia and peripheral neuropathy as viable

diagnoses based upon the medical evidence.  The ALJ relied upon Dr. Winkler's

testimony to find that there was no objective basis or evidence of an underlying condition to support the plaintiff's allegations of disabling pain.  Thus, the ALJ found that Plaintiff had not established an underlying medical condition—the first prong of the pain standard.  Because he found Plaintiff had no medical condition causing disabling pain, the ALJ implicitly determined Plaintiff had not satisfied the pain standard; therefore, evaluation of her subjective complaints was not necessary.  *See Reliford*, 444 F. Supp. 2d at 1189 n.1.

## B.   The ALJ Did Not Limit Dr. Winkler's Testimony

Plaintiff's second argument is that the Commissioner's decision should be reversed and remanded for proper consideration because the ALJ erred by instructing Dr. Winkler to "keep pain out of it" while discussing his opinion regarding whether Plaintiff has an underlying medical condition and whether a basis exists for Plaintiff's subjective complaints of pain. [Pl.'s Mem. 12].  However, Plaintiff removes this statement from its context within the hearing testimony, and is therefore mistaken. The page of the hearing transcript Plaintiff cites contains a discussion in which the ALJ asked Dr. Winkler to list the claimant's severe medically-determinable impairments. [R. 550].  Dr. Winkler responded that the "only impairment would be a complaint of pain." [R. 550].  The ALJ responded that pain would not constitute an impairment.  Dr. Winkler explained that he was considering a portion of Listing 1.00

that indicates pain may be an important factor contributing to functional loss.  The ALJ again asked Dr. Winkler:  "What are the severe medically-determinable impairments?"  Dr. Winkler asked whether this was "[o]n an objective basis . . . ."  The ALJ told Dr. Winkler that the presence of a medically-determinable impairment must be on an objective basis. [R. 550].  Therefore, it is clear the ALJ was not asking Dr. Winkler to eliminate pain as a consideration, but rather emphasizing that "a complaint of pain" (which was the first impairment identified by Dr. Winkler) could not be the medically-determinable impairment used to support Plaintiff's pain testimony.  Contrary to Plaintiff's assertion,  Dr. Winkler was not instructed to remove pain from his testimony altogether.  Rather, the ALJ merely clarified the standard against which Dr. Winkler should state his opinions.  Accordingly, the ALJ's decision is not due to be reversed for Dr. Winkler's failure to discuss Plaintiff's pain.

## C.    Substantial Evidence Supports the ALJ's Decision Not to Include Peripheral Neuropathy as Severe Impairment

Plaintiff's third and final argument on appeal is that the Commissioner's decision should be reversed and remanded for consideration of a "severe" impairment not mentioned by the ALJ. [Pl.'s Mem. 13].  The court cannot agree.

Plaintiff contends that the "undisputed testimony from Dr. Winkler and the evidence from the electrodiagnostic testing establish[es] that [she] suffers peripheral

neuropathy of the lower extremities." [Pl.'s Mem. 13].   However, Plaintiff is mistaken. First, Plaintiff misreads or misinterprets Dr. Winkler's testimony regarding the nerve conduction study.   Contrary to Plaintiff's assertion, Dr. Winkler testified that based upon the results of that study, he did not find adequate support for a neuropathy diagnosis. [R. 551, 553].   Moreover, Dr. Winkler testified that the test was credible only to the extent that it was supported by other objective results. [R. 555-556].   Specifically, Dr. Winkler stressed that the test report itself indicated that "clinical correlation is recommended" to substantiate its findings. [R. 327; 555-56]. The ALJ referenced the nerve conduction study in his decision but credited Dr. Winkler's testimony regarding the need for further testing to confirm its conclusions. [R. 25].

The Eleventh Circuit has held that the severity of a claimant's disability "must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards or bodily perfection or normality." *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986).   In one letter written to Plaintiff's attorney, Dr. Ulrich noted that Plaintiff could not work due to her pain.   However, Dr. Ulrich did not specifically mention neuropathy nor did he explain the impact of the alleged neuropathy on Plaintiff's ability to work.   Moreover, as already discussed in detail, Dr. Winkler rejected the neuropathy diagnosis and the ALJ provided specific

reasons for accepting this testimony and rejecting Dr. Ulrich's conclusions. Therefore, the court cannot say that Plaintiff met her burden of establishing that neuropathy was a severe impairment. Alternatively, the court notes that the Eleventh Circuit has recognized, albeit in an unpublished opinion, that "[n]othing requires that the ALJ must identify, at step two all of the impairments that should be considered severe" and that even if an ALJ errs by not recognizing every severe impairment, the error is harmless if the ALJ finds at least one severe impairment. *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 825 (11th Cir. 2010); *see also Diorio v. Heckler,* 721 F.2d 726, 728 (11th Cir. 1991) (applying the harmless error doctrine to social security cases). Accordingly, even if the ALJ erred by failing to include neuropathy in his list of severe impairments—which he did not—the failure to do so would amount to harmless error. *See Heatly*, 382 F. App'x at 825. Therefore, the Commissioner's decision is not due to be reversed on this ground.

## VI.   Conclusion

For the reasons stated above, the court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and that proper legal standards were applied. Accordingly, the Commissioner's decision is due to be affirmed. A separate order in accordance with this memorandum opinion will be entered.

Done this <u>8th</u> day of <u>October 2013</u>.

_____
L. Scott Coogler
United States District Judge

[160704]